AIR PRODUCTS BLUE ENERGY, LLC,   CIVIL ACTION NO. 22-809

    *Plaintiff*

                              JUDGE SHELLY D. DICK

**VERSUS**

**LIVINGSTON PARISH GOVERNMENT,**   **MAGISTRATE JUDGE RICHARD**
**ET AL.**   **L. BOURGEOIS, JR.**

    *Defendants.*

---

**VERIFIED AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF**

**NOW INTO COURT**, through undersigned counsel, comes Plaintiff, Air Products Blue Energy, LLC ("Air Products"), which files this Verified Amended Complaint seeking a judgment declaring that Livingston Parish Ordinance "No. 22-49" ("L.P. Ordinance No. 22-49")[1] is invalid and unenforceable, and providing injunctive relief to bar the enforcement of L.P. Ordinance No. 22-49. Through L.P. Ordinance No. 22-49, Livingston Parish attempts to improperly place a 12-month moratorium on the construction and drilling of Class V wells, as well as seismic surveying within Livingston Parish. These actions are preempted by federal and state law.

**INTRODUCTION**

**1.**

Air Products is compelled to bring this litigation in order to demonstrate the invalidity of L.P. Ordinance No. 22-49.  On October 13, 2022, the Livingston Parish Council adopted L.P. Ordinance No. 22-49 by a vote of 5-2. Upon information and belief, the Livingston Parish Council

---

[1] https://www.livingstonparishcouncil.com/sites/default/files/fileattachments/parish_council/page/14583/class_v_moratorium.pdf (last visited Nov. 17, 2022).

submitted the ordinance to the Parish President on October 17, 2022. Upon information and belief, the ordinance was neither approved nor vetoed by the Parish President within 10 days of its submission to him and, as a result, the ordinance is considered to have been adopted after October 27, 2022. It then took effect 15 days after October 28, 2022, on November 12, 2022.[2] Prior to voting on the ordinance, Livingston Parish Council members acknowledged that their attorney advised them that (1) "it's illegal" and (2) they "have no jurisdiction." Notwithstanding that legal advice, the Council passed L.P. Ordinance No. 22-49.

**2.**

This ordinance directly contravenes the authority of the Louisiana Legislature, the Louisiana Department of Wildlife and Fisheries ("LDWF"), the Louisiana State Mineral and Energy Board, the U.S Army Corps of Engineers, and the U.S. Environmental Protection Agency ("EPA"), among others. It also introduces uncertainty into a tightly structured and coordinated state and federal regulatory scheme.

**3.**

Additionally, L.P. Ordinance No. 22-49 appears to contradict the Parish's prior ordinance, L.P. Ordinance No. 22-45, which purports to place a twelve-month moratorium on construction of Class VI injection wells in Livingston Parish. While both L.P. Ordinances No. 22-45 and No. 22-49 are preempted under federal and state law, this litigation only challenges the legality of L.P. Ordinance No. 22-49. Moreover, regardless of whether L.P. Ordinance No. 22-45 is legally enforceable, its stated purposes included allowing time for development of extensive site characterization requirements and other feasibility and safety-related matters. Yet, the Parish's current moratorium, L.P. Ordinance No. 22-49, purports to block the very activities (Class V test

---

[2] Livingston Parish Home Rule Charter §§ 2-13(B), 2-12(C).

#100789571v1

wells and seismic testing) which would address the safety concerns expressed in the prior moratorium. In other words, the very actions that must be taken to achieve the purposes of L.P. Ordinance No. 22-45 will purportedly violate L.P. Ordinance No. 22-49.

**4.**

In light of the acknowledged invalidity of L.P. Ordinance No. 22-49, and its conflict with the numerous state and federal statutes, regulations, and permitting authorities, Air Products is left with no choice but to bring this lawsuit.

**PARTIES**

**5.**

Plaintiff herein is **Air Products Blue Energy, LLC**, a Delaware limited liability company, with Air Products and Chemicals, Inc., being its sole member. Air Products and Chemicals, Inc., is a Delaware corporation with its principal place of business located in Pennsylvania.

**6.**

Made defendant herein is **Livingston Parish Government**, a political subdivision of the State of Louisiana, and therefore, a citizen of Louisiana for purposes of diversity-of-citizenship jurisdiction.

**7.**

Made defendant herein is **Livingston Parish Council**, a political subdivision of the State of Louisiana, and therefore, a citizen of Louisiana for purposes of diversity-of-citizenship jurisdiction.

**8.**

Made defendant herein is **Jason Ard**, solely in his official capacity as **Sheriff for the Parish of Livingston**. Sheriff Ard is the chief law enforcement officer in Livingston Parish, La.

3

Const. art. V, § 27, a political subdivision of the State of Louisiana, and a citizen of Louisiana for purposes of diversity-of-citizenship jurisdiction. As the chief law enforcement officer of Livingston Parish, Sheriff Ard would be responsible for enforcing L.P. Ordinance No. 22-49.

## JURISDICTION AND VENUE

### 9.

This Court has original jurisdiction over this case pursuant to 28 U.S.C. § 1332 (diversity-of-citizenship jurisdiction).

### 10.

Air Products is a citizen of Delaware and Pennsylvania, whereas the defendants are each citizens of Louisiana.

### 11.

Accordingly, there is complete diversity between the parties.

### 12.

Furthermore, the amount in controversy exceeds $75,000, as Air Products has already expended more than $75,000 to prepare for seismic exploration and test well development that it cannot recover if L.P. Ordinance No. 22-49 is not declared to be invalid. In addition, if Air Products is unable to proceed with its otherwise lawful activities, Air Products will lose more than $75,000 it has committed toward the exercise of its permitted rights.

### 13.

This Court also has original jurisdiction over this case pursuant to 28 U.S.C. § 1331 (federal question jurisdiction).

### 14.

Air Products is asserting claims that arise under federal law, including the Safe Drinking

Water Act, 42 U.S.C. § 300f, *et seq.*, and this Court has supplemental jurisdiction over any state law claims pursuant to 28 U.S.C. § 1367.

**15.**

Air Products also seeks equitable relief and a declaratory judgment pursuant to 28 U.S.C. § 2201 and § 2202.

**16.**

Venue in this federal district is appropriate under 28 U.S.C. § 1391(b)(2), because "a substantial part of the events or omissions giving rise to the claim occurred" in Livingston Parish.

## FACTUAL BACKGROUND

### The Carbon-Dioxide Storage Agreement

**17.**

Effective October 13, 2021, Air Products entered into a Carbon Dioxide Storage Agreement with the State of Louisiana, LDWF, and the Louisiana Wildlife & Fisheries Commission, acting through its authorized agent, the Louisiana State Mineral and Energy Board, "for the purpose of injecting Carbon Dioxide into certain geologic strata or formations for permanent storage" (the "Storage Agreement").[3]

**18.**

Pursuant to the terms of the Storage Agreement, the State granted Air Products the following rights, among others:

> the sole and exclusive right to control, conduct, or perform all activities on the Property as may be necessary or incidental to the Permitted Purposes, including, but not limited to . . . viewing and performing testing, **such as geological and geophysical surveys, seismic tests, and other testing** and data relating to the

---

[3] http://www.dnr.louisiana.gov/assets/OMR/media/forms_pubs/AIR_PRODUCTS_FINAL_AGREEMENT_10-22-2021.pdf (last visited Nov. 15, 2022).

Property and Storage Reservoirs to determine the capacity and suitability of the Storage Reservoirs and the Property for the Permitted Purposes. [4]

**19.**

Among the land and water bottoms included in the Storage Agreement are state-owned water bottoms in Lake Maurepas, part of which are located in Livingston Parish.

**20.**

In conjunction with the Storage Agreement, Air Products announced a $4.5 billion investment to construct a state-of-the-art, clean-energy complex in Louisiana (the "Clean-Energy Project").

**21.**

Planned to be online by 2026, the Clean-Energy Project supports Louisiana's ambitious climate, energy, and economic competitiveness goals.

**22.**

Once fully operational, the Clean-Energy Project will produce clean hydrogen for Air Products' customers in the U.S. Gulf Coast, as well as clean ammonia.

**23.**

Air Products' Clean-Energy Project is estimated to create 170 permanent jobs in Louisiana, with a total annual payroll of approximately $15.9 million, in addition to more than 2,000 construction jobs over a three-year period.

---

[4] Carbon–Dioxide Storage Agreement, dated October 13, 2021, § 5(k) (emphasis added). "Permitted Purposes" means "the right to use the Property for all purposes and rights granted in this Agreement, including, without limitation, the sole and exclusive right to use and occupy the Property for the purposes and rights set forth in this Agreement, and the full control of all operations in connection with the construction, preparation, installation, maintenance, operation, expansion, enlargement, modification, replacement, repair, and disposition of the Facilities, Injecting any Carbon Dioxide Stream into the Storage Reservoirs, the installation, maintenance, repair, replacement and removal of Improvements and Equipment, the Injection, Storage, transportation, shipment, handling, transmission, Withdrawal, or other disposition of Carbon Dioxide Stream(s) Stored, or to be Stored from time to time, in each Facility, and monitoring each Facility and/or Storage Reservoirs." *Id.*, § 5.4.

#100789571v1

**24.**

Pursuant to the rights granted under the Storage Agreement, Air Products is proposing to develop and operate a sequestration facility (the "Sequestration Project") that will permanently sequester approximately 5 million metric tons of carbon dioxide ("$CO_2$") per year.

**25.**

The proposed permanent sequestration area for $CO_2$ would be approximately one mile beneath the bottom of Lake Maurepas, part of which is in located in Livingston Parish.

**26.**

The U.S. Department of Energy states that carbon capture and sequestration "enables industry to continue to operate while emitting fewer greenhouse gases (GHGs), making it a powerful tool for addressing mitigation of anthropogenic $CO_2$ in the atmosphere."[5]

**27.**

Large-scale, commercial carbon capture and sequestration projects have been operating for many years in North America and Europe, and many other projects are currently being developed.[6]

**Proposed Data-Gathering Efforts for the Sequestration Project**

**28.**

In connection with the proposed Sequestration Project, a subsurface seismic survey of Lake Maurepas is planned to take place beginning December 2, 2022. This survey will provide data to help Air Products examine the feasibility of carbon sequestration beneath Lake Maurepas. The survey will also help state and federal regulating agencies evaluate whether permits should be granted for carbon sequestration beneath Lake Maurepas.

---

[5] https://netl.doe.gov/carbon-management/carbon-storage/faqs/carbon-storage-faqs (last visited Nov. 15, 2022).

[6] *Id.*

**29.**

In this case, the seismic survey will involve a three-dimensional ("3D") visual inspection of underground geology to assess the feasibility of the subsurface geology for permanent $CO_2$ storage and to identify the best places to permanently store $CO_2$.

**30.**

Seismic surveying uses sound waves to produce 3D images of underground geological structures and has been used safely for decades in Louisiana in connection with oil and gas exploration.

**31.**

In connection with Air Products' seismic survey, these sound waves will be produced using small charges placed 60 feet beneath the water bottom.

**32.**

The charges are used one at a time, and the planned size of charges for the seismic survey is only a quarter of the size allowed by regulation to safely conduct a subsurface survey.

**33.**

The 3D seismic survey is planned to be conducted in six phases, so that most of Lake Maurepas is left completely open for commercial and recreational use during each phase of the testing. The survey plan also seeks to avoid any disruption to spring and summer boating seasons on Lake Maurepas.

**34.**

Once the seismic survey is complete, there will be no trace left behind.

**35.**

To conduct the seismic surveying operations, Air Products' seismic contractor—Exoduas, Inc. ("Exoduas")—obtained a Permit to Conduct Geophysical and Geological Surveys on State Owned Lands and Water Bottoms (Permit No. 2022/23-001) from the State Mineral and Energy Board on September 30, 2022.

**36.**

The Permit to Conduct Geophysical and Geological Surveys on State Owned Lands and Water Bottoms permits seismic surveying work to be conducted in Lake Maurepas, which is a State-owned water bottom.

**37.**

Additionally, Air Products' seismic contractor Exoduas obtained a Seismic Letter of Clearance from LDWF on September 29, 2022, as well as an Authorization of Seismic Operations, pursuant to La. Admin. Code tit. 76, p. 1, section 301, on October 3, 2022, permitting Exoduas to conduct seismic operations in Livingston Parish in connection with Air Products' project.

**38.**

Air Products also received the necessary approvals from the Louisiana Office of Coastal Management and U.S. Army Corps of Engineers.

**39.**

Accordingly, Air Products, through its seismic contractor, is fully permitted to conduct seismic operations on the State-owned water bottoms of Lake Maurepas and the surrounding area.

**40.**

In addition to the seismic survey, Air Products has begun preparatory work to install two Class V stratigraphic test wells on Lake Maurepas. One of these wells will be within the boundaries

of Livingston Parish according to the parish boundaries on the maps found on the Strategic Online Natural Resources Information System ("SONRIS") website, which is maintained by the Louisiana Department of Natural Resources ("DNR") and utilized in connection with DNR permits and permit applications.

<div align="center">**41.**</div>

The purpose of these stratigraphic test wells is to further assess the geology beneath Lake Maurepas in connection with the potential Sequestration Project.

<div align="center">**42.**</div>

Air Products received the necessary permits to conduct the work associated with the Class V test wells from the U.S. Army Corps of Engineers and the Louisiana Office of Coastal Management.

<div align="center">**43.**</div>

In addition, Air Products has submitted an application to the DNR Office of Conservation for the permit for the Class V stratigraphic test well within the boundaries of Livingston Parish, as shown in SONRIS.

<div align="center">**44.**</div>

Continued preparatory work for the drilling of the Class V test wells, including securing access routes and preparing the well pad location, will occur within the boundaries of Livingston Parish, as shown in SONRIS.

<div align="center">**45.**</div>

In early September, 2022, Air Products had already commenced activities within the boundary of Livingston Parish, as shown in SONRIS, but those activities in Livingston Parish were discontinued on or about September 25, 2022 in light of information indicating that the

#100789571v1

Livingston Parish Council might be considering taking action to prohibit such activities.

**46.**

More preparatory work remains to be performed within the Livingston Parish boundary (as shown in SONRIS).

**47.**

The moratorium, if left in place, will improperly restrict Air Products' lawfully-permitted activities and improperly impair Air Products' lawful contractual rights and obligations.

**L.P. Ordinance No. 22-49**

**48.**

Livingston Parish is a Council-President Home Rule Charter form of government, which allows for two branches of government; the Executive Branch or Parish President, and the Legislative Branch or Parish Council.

**49.**

Livingston Parish has 10 elected officials—one Parish President and nine Council Members.

**50.**

At the Livingston Parish Council meeting on October 13, 2022, the Livingston Parish Council voted to adopt L.P. Ordinance No. 22-49 by a vote of 5-2 in favor of passage (two council members were absent).

**51.**

During the Council meeting, the Council acknowledged a letter sent to the Council by the

#100789571v1

parish attorney advising that the proposed ordinance covered matters "not under their jurisdiction"[7] and would be invalid if passed.

**52.**

The preamble to L.P. Ordinance No. 22-49 reads as follows:

AN ORDINANCE TO ADOPT A TEMPORARY TWELVE (12) MONTH MORATORIUM REGARDING THE CONSTRUCTION AND DRILLING OF CLASS V INJECTION WELLS AND MONITORING WELLS PROHIBITING ANY ACTIVITIES ASSOCIATED WITH CLASS V WELLS WHERE THE WELL IS SPECIFIC TO GEOLOGIC TESTING OF ROCK FORMATION, MONITORING, DRILLING, OR INJECTING OF CO2 FOR LONG TERM STORAGE. THIS SHALL INCLUDE THE PROHIBITION OF ALL ACTIVITIES WITHIN LIVINGSTON PARISH AND THE WATERWAYS HEREIN; INCLUDING BUT NOT LIMITED TO DETONATION OF CHARGES FOR SEISMIC TESTING, DRILLING, OR INJECTING OF LIQUIDS INTO A CLASS V WELL WITHIN THE PARISH OF LIVINGSTON.

**53.**

Thus, under the terms of its preamble, L.P. Ordinance No. 22-49 purports to be a 12-month moratorium on, among other things, (1) the construction and drilling of Class V injection and monitoring wells within Livingston Parish, and (2) the detonation of charges for seismic surveying and testing within Livingston Parish.

**54.**

Similarly, under the terms of its resolving paragraph, L.P. Ordinance No. 22-49 purports to "HEREBY ENACT[] A TEMPORARY MORATORIUM FOR TWELVE (12) MONTHS to further evaluate the permitting needs of the Parish of Livingston to establish regulations that would permit such activities within the Parish of Livingston and its waterways."

---

[7] https://www.theadvocate.com/baton_rouge/news/article_cfbe392c-4b22-11ed-956a-f7fa7d94b2b2.html (last visited Oct. 17, 2022).

#100789571v1

**55.**

However, under the terms of the ordaining paragraph of L.P. Ordinance No. 22-49, the Council purports to ordain "as of the effective date of this ordinance, a moratorium on the construction, drilling, and monitoring of injections wells and disposal wells including but not limited to the waterways of Livingston Parish."

**56.**

In addition to being preempted by federal and state law, L.P. Ordinance No. 22-49 is likely void for vagueness as the result of the inconsistencies between the various statements of effect, including with respect to both scope and duration.

**57.**

L.P. Ordinance No. 22-49 contains other defects that may render it unenforceable. For example, it does not to purport to amend the Livingston Parish Code of Ordinances, as required by Louisiana law.

**58.**

In addition, L.P. Ordinance No. 22-49 uses both the language of a non-binding resolution and the language specific to a binding ordinance. As a result, some portions of the ordinance may lack the force of law.

**59.**

Air Products' property rights contained in the Storage Agreement, and its rights under the various state and federal permits discussed herein, are improperly restricted and impeded by L.P. Ordinance No. 22-49. Such restrictions constitute an injury-in-fact, traceable to the ordinance, and likely to be redressed by a favorable decision in this matter. *See, e.g., Energy Mgmt. Corp. v. City of Shreveport*, 397 F.3d 297 (5th Cir. 2005).

#100789571v1

**60.**

The present dispute, which involves the restriction and impingement of the rights to conduct seismic surveying beginning in December, 2022 and the drilling of Class V test wells for which permits have already been acquired and/or applied for, is ripe for adjudication.

## CAUSE OF ACTION NO. 1

## DECLARATORY JUDGMENT REGARDING INVALIDITY OF L.P. ORDINANCE NO. 22-49 AS APPLIED TO SEISMIC SURVEYS AND TESTING

**61.**

L.P. Ordinance No. 22-49 is preempted by Louisiana state law insofar as it bans seismic surveys and testing within Livingston Parish.

**62.**

Pursuant to Louisiana Constitution Article VI, a municipal authority governed by a home rule charter, such as Livingston Parish, possesses powers in affairs of local concern within its jurisdiction that are as broad as those of the State, except when limited by the constitution, laws permitted by the constitution, or its own home rule charter.

**63.**

Article VI, § 9(B) of the Louisiana Constitution sets forth a constitutional limitation on the broad powers of a home rule charter government when it states: "Police Power Not Abridged. Notwithstanding any provision of this Article, the police power of the state shall never be abridged."

**64.**

Louisiana courts routinely acknowledge the constitutional police power vested in the Louisiana Legislature.

#100789571v1

**65.**

Moreover, Article XI § 1 of the Louisiana Constitution states:

The natural resources of the state, including air and water, and the healthful, scenic, historic, and esthetic quality of the environment shall be protected, conserved, and replenished insofar as possible and consistent with the health, safety, and welfare of the people. **The legislature shall enact laws to implement this policy**.[8]

**66.**

Pursuant to the Louisiana Revised Statutes, the Louisiana Legislature bestowed the State

Mineral and Energy Board with the power to regulate all seismic surveys on State-owned lands:

**The State Mineral and Energy Board shall have exclusive authority to grant exclusive and nonexclusive permits to conduct geophysical and geological surveys of any kind on state-owned lands, including water bottoms.** No person shall conduct a geophysical or geological survey on state-owned lands, including water bottoms, without obtaining a permit. These permits shall be granted pursuant to rules promulgated under the provisions of the Administrative Procedure Act by the Department of Natural Resources. No permit shall be granted covering lands over which the state has a mere servitude without consent of the owner of the abutting property.[9]

**67.**

The term "geophysical and geological survey" is defined to mean:

magnetometer surveys, gravitymeter surveys, torsion balance surveys, **seismograph surveys, using either the reflection or the refraction method**, soil analysis surveys which tend to show the presence or absence of hydrocarbons, electrical surveys, using either the Eltran or some similar method and any method utilizing short wave radio.[10]

**68.**

With regard to seismic surveys, the Louisiana Legislature also bestowed LDWF with the

power to regulate seismic activity.

---

[8] (emphasis added).

[9] La. R.S. § 30:212(A) (emphasis added).

[10] La. R.S. § 30:211(B) (emphasis added).

#100789571v1

**69.**

LDWF is charged with "[t]he control and supervision of the wildlife of the state, including all aquatic life" under Article IX, Section 7 of the Louisiana Constitution of 1974.

**70.**

Pursuant thereto, La. R.S. § 30:214 states:

Any person who makes or causes to be made a geophysical survey entailing the use of shot points in any lake, river, or stream bed or other bottoms, the title to which is in the public, shall obtain from the State Mineral and Energy Board a special permit therefor. **This permit shall be granted under the rules and regulations which may from time to time be promulgated by the Department of Wildlife and Fisheries for the protection of oysters, fish, and wildlife**.[11]

**71.**

Furthermore, La. R.S. § 36:609(B)(2) states that the Office of Wildlife, within LDWF "shall . . . [p]erform the functions of the state relative to the administration, operation, and law enforcement of programs, including . . . the regulation of seismic operations."

**72.**

And the Louisiana Administrative Code, Title 76, Section 301(B) states:

In order to protect, conserve, and replenish the wildlife of the state of Louisiana, including all aquatic life, and pursuant to the authority conferred by Article IX, Section 7 of the Louisiana Constitution of 1974, R.S. 30:214 et seq., and R.S. 36:609; the following rules shall form and after promulgation date, govern any exploration work involving the discharge of explosives and other energy sources in the state of Louisiana for geophysical exploration . . . No geophysical exploration work shall commence without the approval of the secretary of the department or his designee. The Department of Wildlife and Fisheries, Marine Fisheries Division, Seismic Section is hereby authorized and directed to enforce and administer these regulations with full power and authority to take all appropriate actions to ensure proper administration and compliance.

---

[11] (emphasis added).

#100789571v1

**73.**

The decision of the Louisiana Legislature to place permitting authority for seismic (*i.e.*, geophysical) surveys in the hand of the State Mineral and Energy Board and LDWF supersedes and preempts any local ordinance to the contrary.

**74.**

Accordingly, L.P. Ordinance No. 22-49 is preempted and invalid insofar as it purports to prohibit seismic surveys within Livingston Parish, because the Louisiana Constitution provides the Legislature with the preemptive police power of the State, which includes the authority to regulate such activities within Louisiana. The Legislature expressly designated the State Mineral and Energy Board and LDWF as the state agencies to exercise this authority. L.P. Ordinance No. 22-49 abridges police power of the State by purporting to prohibit activities regulated—and, in this case, approved by—those agencies.

**75.**

Therefore, Air Products is entitled to a declaratory judgment declaring that L.P. Ordinance No. 22-49 is preempted and, therefore, invalid insofar as it places a moratorium on seismic surveys within Livingston Parish in violation of the Louisiana Constitution and Louisiana statutes.

## CAUSE OF ACTION NO. 2

**INJUNCTIVE RELIEF BARRING ENFORCEMENT OF L.P. ORDINANCE NO. 22-49 AS APPLIED TO SEISMIC SURVEYS AND TESTING**

**76.**

Also, because L.P. Ordinance No. 22-49 is preempted and invalid under Louisiana law, Air Products is entitled to injunctive relief, including a preliminary injunction and a permanent injunction, barring the enforcement of L.P. Ordinance No. 22-49 insofar as it places a moratorium on seismic surveys within Livingston Parish.

**77.**

The four factors required for injunctive relief, see *eBay, Inc. v. MercExchange, LLC*, 547 U.S. 388, 126 S. Ct. 1837, 1840, 164 L. Ed. 2d (2006), are satisfied with respect to seismic surveys and testing. First, Air Products is likely to succeed on the merits of its claims for declaratory judgment and injunctive relief that L.P. Ordinance No. 22-49 is invalid insofar as it places a moratorium on seismic surveys within Livingston Parish because it has demonstrated that the ordinance is preempted by state law.

**78.**

Second, while irreparable injury is not a prerequisite because the conduct sought to be restrained is unconstitutional or unlawful, in the alternative, Defendants' application and enforcement of L.P. Ordinance No. 22-49 to prohibit Air Products from conducting seismic operations will cause project delays and prevent Air Products from completing permitted activities within the timeframes directed by state and federal regulators, thereby harming Air Products' goodwill, competitive advantage, and economic interests in ways that are incapable of ascertainment in monetary terms, or especially difficult or speculative to establish in monetary terms.

**79.**

Third and fourth, because Air Products demonstrated a likelihood of success on the merits of its preemption claim, the balance of equities and public interest factors weigh in favor of granting the preliminary injunction. Furthermore, the specific threat of continuing injuries to Air Products far outweighs any potential injury to Defendants, who stand to lose nothing if the preliminary injunction is entered. Moreover, the requested preliminary injunctive relief will not disserve the public interest; an injunction to enforce the correct application of the law, in and of

18

itself, serves the public interest.

**80.**

Therefore, Air Products is entitled to injunctive relief, including a preliminary injunction and a permanent injunction, barring the enforcement of L.P. Ordinance No. 22-49 insofar as it places a moratorium on seismic surveys within Livingston Parish.

## CAUSE OF ACTION NO. 3

**DECLARATORY JUDGMENT REGARDING INVALIDITY OF L.P. ORDINANCE NO. 22-49 AS APPLIED TO CLASS V WELLS**

**81.**

The federal Safe Drinking Water Act ("SDWA"), 42 U.S.C. § 300f, *et seq.*, is a comprehensive regulatory program designed to protect underground sources of drinking water.

**82.**

The SDWA and associated regulations promulgated by the EPA fully occupy the field of regulating underground sources of drinking water.

**83.**

Under the SDWA, the EPA is required to develop an underground-injection control program in order to protect underground sources of drinking water.

**84.**

The EPA grants primary enforcement authority, also known as "primacy," to a state in order to implement the state's EPA-approved underground injection control ("UIC") program.

**85.**

On April 23, 1982, the EPA granted primacy over Class I, II, III, IV, and V injection wells to the Louisiana Office of Conservation.

**86.**

Class V injection wells include stratigraphic test wells.

**87.**

In accordance with the grant of primacy, the Legislature granted the Louisiana Office of Conservation authority to regulate these wells, pursuant to the state's EPA-approved UIC program, including with respect to Class V injection wells.[12]

**88.**

The Office of Conservation's program is responsible for the administration, permitting, inspection, and enforcement activities for Class V injection wells under R.S. § 30:4.1, LAC 43:XVII, Subpart 1-4 and LAC 43:XIX, Subpart 1, Chapter 4.

**89.**

In the case of Class V injection wells, the State has expressly given the assistant secretary of the Office of Conservation the power to "regulate, by rules, the drilling, casing, cementing, disposal interval, monitoring, plugging, and permitting of disposal wells that are used to inject hazardous waste products in the subsurface." La. R.S. § 30:4.1(B).

**90.**

The Office of Conservation has promulgated comprehensive regulations approved by EPA to implement a Class V underground injection control program.

**91.**

The Louisiana Legislature's decision to expressly regulate an area of environmental law and place that regulatory power in a state agency supersedes any local ordinance to the contrary.

---

[12] *See* La. R.S. § 30:4.1.

<center>**92.**</center>

By instituting a moratorium on the drilling of Class V wells, L.P. Ordinance No. 22-49 expressly contravenes the provisions of the SDWA and Louisiana law and regulations that allow Class V wells, and thus, improperly interferes with the UIC program.

<center>**93.**</center>

Accordingly, L.P. Ordinance No. 22-49 is preempted under both federal and state law insofar as it prohibits the drilling of Class V injection wells within Livingston Parish, and Air Products is therefore entitled to a declaratory judgment declaring that L.P. Ordinance No. 22-49 is preempted and invalid insofar as it prohibits the drilling of Class V injection wells.

<center>**CAUSE OF ACTION NO. 4**</center>

<center>**INJUNCTIVE RELIEF BARRING ENFORCEMENT OF L.P. ORDINANCE NO. 22-49 AS APPLIED TO CLASS V WELLS**</center>

<center>**94.**</center>

Also, because L.P. Ordinance No. 22-49 is preempted and invalid under both federal and Louisiana law, Air Products is entitled to injunctive relief, including a preliminary injunction and a permanent injunction, barring the enforcement of L.P. Ordinance No. 22-49 insofar as it prohibits the drilling of Class V wells.

<center>**95.**</center>

The four factors required for injunctive relief, see *eBay, Inc. v. MercExchange, LLC,* 547 U.S. 388, 126 S.Ct. 1837, 1840, 164 L.Ed.2d (2006), are satisfied as to Class V wells. First, Air Products is likely to succeed on the merits of its claims for declaratory judgment and injunctive relief that L.P. Ordinance No. 22-49 is invalid insofar as it prohibits the drilling of Class V wells because it has demonstrated that the ordinance is preempted by both federal and state law.

<center>21</center>

**96.**

Because this case involves federal preemption, the second, third, and fourth factors are satisfied based on satisfaction of the first factor. In the alternative, the second, third, and fourth factors are satisfied as to Class V wells for the same reasons set forth above as to seismic surveys and testing.

**97.**

Therefore, Air Products is entitled to injunctive relief, including a preliminary injunction and a permanent injunction, barring the enforcement of L.P. Ordinance No. 22-49 insofar as it prohibits the drilling of Class V wells.

## PRAYER FOR RELIEF

**WHEREFORE**, after due proceedings are had, Air Products Blue Energy, LLC, respectfully requests that this court grant the following relief against the Livingston Parish Council, Livingston Parish Government, and Sheriff Jason Ard,

1. Declaring that L.P. Ordinance No. 22-49 is preempted under Louisiana law and invalid insofar as it places a moratorium on seismic surveys within Livingston Parish;

2. Declaring that L.P. Ordinance No. 22-49 is preempted under federal law and Louisiana law and invalid insofar as it places a moratorium on the drilling of Class V wells within Livingston Parish;

3. Issuing any and all necessary injunctive relief to bar the enforcement of L.P. Ordinance No. 22-49 insofar as it places a moratorium on seismic surveys within Livingston Parish;

4. Issuing any and all necessary injunctive relief to bar the enforcement of L.P. Ordinance No. 22-49 insofar as it places a moratorium on the drilling of Class V injection wells

#100789571v1

within Livingston Parish; and

5.    Granting Air Products Blue Energy, LLC such further and additional relief as the Court may deem just and proper.

<div style="margin-left:50%">

Respectfully submitted,

*/s/ Michael C. Drew*
Marjorie J. McKeithen (La. Bar No. 21767)
Michael C. Drew (La. Bar No. 30884)
Brett S. Venn (La. Bar No. 32954)
Joshua A. Norris (La. Bar No. 32912)
Nicole M. Duarte (La. Bar No. 22507 )
**Jones Walker LLP**
201 St. Charles Ave., 49th Floor
New Orleans, Louisiana 70170
Telephone (504) 582-8420
Facsimile (504) 589-8420
Email: mmckeithen@joneswalker.com
         mdrew@joneswalker.com
         bvenn@joneswalker.com
         jnorris@joneswalker.com
         nduarte@joneswalker.com

and

Justin J. Marocco (La. Bar No. 35226)
Trey K. Bartholomew (La. Bar No. 39114)
**Jones Walker LLP**
445 North Blvd., Ste. 800
Baton Rouge, Louisiana 70802
Telephone: (225) 248-2415
Facsimile: (225) 248-2000
Email: jmarocco@joneswalker.com
         tbartholomew@joneswalker.com

</div>

#100789571v1

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing pleading has been served upon all counsel of record by filing the same in this Court's CM/ECF system and on any unrepresented parties via certified mail this 18th day of November, 2022.  Additionally, pursuant to La. R.S. § 13:5107(C), a copy of the foregoing pleading has been served upon the Register of the Louisiana Office of State Lands and the Secretary of the Louisiana Department of Natural Resources via certified mail and/or email (with prior written consent) on this 18th day of November, 2022.

*/s/ Michael C. Drew*

#100789571v1

# UNITED STATES DISTRICT COURT

## MIDDLE DISTRICT OF LOUISIANA

| | |
|---|---|
| **AIR PRODUCTS BLUE ENERGY, LLC** | **CIVIL ACTION NO. 22-cv-809** |
| *Plaintiff* | |
| | **JUDGE DICK** |
| **VERSUS** | |
| **LIVINGSTON PARISH GOVERNMENT, ET AL.** | **MAGISTRATE JUDGE BOURGEOIS** |
| *Defendants.* | |

---

## DECLARATION OF ANDREW CONNOLLY

1. I am over 21 years of age and am competent to make the statements that appear in this declaration. I have personal knowledge of the facts included in this declaration and those facts are true and correct.

2. I am a Vice President of Air Products Blue Energy, LLC.

3. I am also the Vice President and General Manager, Low-Carbon Hydrogen Large Projects, for Air Products and Chemicals, Inc., which is the sole member of Air Products Blue Energy, LLC.

4. I have read the allegations in the Verified Amended Complaint for Declaratory and Injunctive Relief ("Amended Complaint").

5. All allegations in the Amended Complaint are true and correct to the best of my knowledge, information, and belief.

6. I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 18th day of November, 2022.

ANDREW CONNOLLY